**DICKINSON WRIGHT PLLC**
Steven A. Caloiaro
Nevada Bar No. 12344
Mackenzie E. Robinson
Nevada Bar No. 16309
100 W. Liberty Street, Suite 940
Reno, Nevada 89501
Tel.: (775) 343-7500
Fax: (844) 670-6009
scaloiaro@dickinsonwright.com
mrobinson@dickinsonwright.com

*Attorneys for Plaintiff*
*Noah Blythe*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEVADA**

| | | |
|---|---|---|
| Noah Blythe, | ) | CASE NO. |
| | ) | |
| *Plaintiff*, | ) | **COMPLAINT** |
| *v.* | ) | |
| | ) | |
| National Collegiate Athletic Association, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| *Defendant*. | ) | |

Plaintiff Noah Blythe, an individual, ("Plaintiff" or "Noah") hereby states his complaint against Defendant National Collegiate Athletic Association, an unincorporated association, ("Defendant" or "NCAA"), as follows:

## INTRODUCTION

1. This dispute centers on a handful of NCAA Bylaws governing athlete eligibility. These rules arbitrarily affect athletes who played at National Association of Intercollegiate Athletics ("NAIA") institutions instead of a NCAA Division I institution. Here, Noah fell victim to this spurious line drawing.

2. Noah played NCAA baseball at a Division II Institution (Hawaii Pacific University) and an NAIA institution (University of Antelope Valley) before trying to play a final season at the University of Nevada, Reno "(University of Nevada"). The University of Nevada is an NCAA



DICKINSON WRIGHT
ATTORNEYS AT LAW

Division I institution. Noah's hope to play a final season follows a college baseball career tortured by a host of hardships outside of his control. His first season, running from 2020 to 2021 at Hawaii Pacific, fell squarely in the middle of the COVID-19 pandemic. Unlike any ordinary season, Hawaii Pacific only scrimmaged two other teams (and he only scrimmaged one of those teams). He then transferred to University of Antelope Valley for three more seasons. That fared hardly any better—all for reasons out of his control. He broke his hand one season, playing a fraction of the games he could have played but for the injury. And then University of Antelope Valley closed down after going bankrupt in the early part of his next season. Noah was able to transfer back to Hawaii Pacific once again, obtaining another year there because his first was all but irrecoverable due to the COVID-19 pandemic. Even still, by that point, Noah played only two normal baseball seasons.

3. And now his career—punctuated by unpredictable and sudden hardships—is going to die at the NCAA's feet. This is because the NCAA (and its member institutions) imposes the so-called "Five-Year Rule," which provides that college athletes generally have four seasons of eligibility and five years to complete those four seasons. But the NCAA takes a step further. Under the NCAA's set of arbitrary and capricious rules determining eligibility "Eligibility Rules", the time Noah spent outside of any NCAA institution counts against those five allotted years. Meaning, that year amidst the COVID-19 Pandemic counts against him. That year he broke his hand counts against him. And probably worst of all: that year his school quite literally shut down in the early part of his season counts against him.

4. Following the U.S. Supreme Court's decision in *Alston v. NCAA*, 594 U.S. 69 (2021), which recognized that the NCAA's prohibitions on the education-related benefits student athletes could receive for their services violated the Sherman Act, the Five-Year Rule's application no longer means that Noah simply cannot play college baseball. It also means Noah is being forced to forego name, image, and likeness ("NIL") opportunities available in the Division I marketplace. This restriction on Noah's ability to enter the Division I market continues to violate the Sherman Act. Courts in this district have already recognized the same. *See generally Martinson v. Nat'l*



DICKINSON WRIGHT
ATTORNEYS AT LAW

*Collegiate Athletic Ass'n*, 804 F. Supp. 3d 1109 (D. Nev. 2025); *Braham v. Nat'l Collegiate Athletic Ass'n*, 794 F. Supp. 3d 824 (D. Nev. 2025).

5. This restriction further evidences a breach of contract and tortious interference claim.

## THE PARTIES

6. Noah Blythe is an individual currently residing in Reno, Nevada.

7. Defendant NCAA is an unincorporated association that acts as the governing body of college sports. The NCAA includes more than 1,100 member colleges and universities throughout the United States, including institutions in the District of Nevada. These member institutions are organized into three divisions, and Division I includes over 350 schools. The University of Nevada, Reno is a Division I institution.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over this action under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 26 of the Clayton Act, 15 U.S.C. § 26. This court also has federal question jurisdiction per 28 U.S.C. § 1331 and original jurisdiction over antitrust regulations per 28 U.S.C. § 1337. This court has pendant jurisdiction over any state law claims per 28 U.S.C. § 1367.

9. This Court can exercise personal jurisdiction over the NCAA because the NCAA transacts business in the District of Nevada, purposely availing itself of the forum. The NCAA and its member institutions hold athletic competitions, sell tickets and merchandise, execute broadcasting agreements, and other revenue-generating activities in the District of Nevada.

10. Venue is proper in the unofficial northern division of the District of Nevada under Section 12 of the Clayton Act, 15 U.S.C. 22, and under 28 U.S.C. § 1391(b)(2).

## FACTUAL BACKGROUND

### A. Applicable Rules

11. For years, the NCAA has advanced an exclusive market of Division I athletics, rotating athletes in and out of coveted "amateur" sports via a thicket of eligibility rules. One of



DICKINSON WRIGHT ATTORNEYS AT LAW

these arbitrary rules is the Five-Year Rule. Plainly stated, the Five-Year-Rule provides that an athlete only has five years to play four seasons of their sport. NCAA Bylaw 12.6; NCAA Bylaw 12.6.1.[1]

12. Critically, the clock starts to run from the date on which an athlete registers as a full-time student at any collegiate institution, whether or not such institution is a member of the NCAA and whether or not the athlete competes in any sport at the non-NCAA institution. NCAA Bylaw 12.6.1.1.[2]

13. Application of this rule has been rife with arbitrary enforcement and exceptions, however. For example, if a student athlete began playing during the COVID-19 pandemic, that athlete was able to obtain an additional season and ensure that season did not count against him. Meaning, that athlete had six years to play at the Division I level.[3]

---

[1] All relevant NCAA Bylaws referenced herein are included in **Ex. A.** NCAA Bylaw 12.6, 12.6.1, 12.6.1.1, and its cross-reference definition to Bylaws 12.02.3 and 14.02.4 are referred to herein as the Eligibility Rules.

[2] A "collegiate institution" is defined as an institution of higher education that: (a) Is accredited at the college level by an agency or association recognized by the secretary of the Department of Education and legally authorized to offer at least a one-year program of study creditable toward a degree; (b) Conducts an intercollegiate athletics program, even though the institution is not accredited at the college level and authorized to offer at least a one-year program of study creditable toward a degree; or (c) Is located in a foreign country. NCAA Bylaw 14.02.4. Meanwhile, intercollegiate competition as used in the Five-Year Rule and its attendant provisions, is defined as is considered to have occurred when a student-athlete in either a two-year or a four-year collegiate institution does any of the following: (a) Represents the institution against outside competition, regardless of how the competition is classified (e.g., contest, scrimmage, exhibition or joint practice session with another institution's team) or whether the student is enrolled in a minimum full-time program of studies; (b) Competes in the uniform of the institution, or, during the academic year, uses any apparel (excluding apparel no longer used by the institution) received from the institution that includes institutional identification; or (c) Competes and receives expenses (e.g., transportation, meals, housing, entry fees) from the institution for the competition. NCAA Bylaw 12.02.3.

[3] *Division I Council extends eligibility for student-athletes impacted by COVID-19*, NCAA (Mar. 30, 2020), https://www.ncaa.org/news/2020/3/30/division-i-council-extends-eligibility-for-student-athletes-impacted-by-covid-19.aspx; *see also* Zach Goodrow, *Understanding the NCAA COVID-19 eligibility extensions*, Lanthorn (Mar 15, 2021), https://lanthorn.com/81318/sports/understand-the-ncaa-covid-19-eligibility-extensions/.



DICKINSON WRIGHT ATTORNEYS AT LAW

14. Bylaw 12.9.4.2—known as the "Rule of Restitution"—provides for extrajudicial punishment if a member institution allows a student athlete to play in contravention of the Eligibility Rules or other NCAA Bylaws.

15. In particular, the Rule of Restitution provides:

> If a student-athlete who is ineligible under the terms of the bylaws or other legislation is permitted to participate in intercollegiate competition contrary to such NCAA legislation but in accordance with the terms of a court restraining order or injunction operative against the institution attended by such student-athlete or against the Association, or both, and said injunction is voluntarily vacated, stayed or reversed or it is finally determined by the courts that injunctive relief is not or was not justified, the Board of Directors may take any one or more of the following actions against such institution in the interest of restitution and fairness to competing institutions.

16. The clear purpose and effect of the Rule of Restitution is to deter challenges to the NCAA's anti-competitive and improper rules and rulings by making it impossible for student-athletes and member schools to rely on validly entered court orders and to obtain meaningful injunctive relief. These penalties can be significant, impacting an institution's athletic program and reputation.[4]

**B. Inability to Exhaust Internal NCAA Process**

17. Against this backdrop, Noah has sought another season of baseball at the University of Nevada for the 2025-2026 season but has been unable to do so. *See* **Ex. B** (Noah Blythe Declaration) ¶ 9.

18. Before enrolling at the University of Nevada in the Fall of 2025, Noah competed at Hawaii Pacific University (Division II) and the University of Antelope Valley (NAIA). *Id.* ¶¶ 2–8.

---

[4] Because this Rule is effectively a form of extortion, colleges and universities typically do not permit a student-athlete to participate in athletic competition even if they obtain a TRO or preliminary injunction finding that an NCAA ruling is likely invalid and enjoining the NCAA from enforcing that unlawful restraint. Courts accordingly enjoin the NCAA from enforcing the Rule of Restitution against student-athletes and their respective institutions who rely on a temporary restraining order or preliminary injunction when participating in intercollegiate athletics. *E.g.*, *Braham v. Nat'l Collegiate Athletic Ass'n*, 794 F. Supp. 3d 824, 840 (D. Nev. 2025); *Ohio v. NCAA*, 706 F. Supp. 3d 583, 601- 02 (N.D.W.V. 2023). Here too, for any preliminary injunctive relief requested to be effective, this Court must enjoin the NCAA from enforcing the Rule of Restitution for complying with an order granting that relief.

DICKINSON WRIGHT ATTORNEYS AT LAW

19. Noah played his 2020-2021 season at Hawaii Pacific, but it was not a real season. The university played only 26 games; 4 of those games against University of Hawaii and 22 games against University of Hawaii at Hilo due to the COVID-19 pandemic. However, Noah did not play in any of the games against the University of Hawaii, and played approximately 21 games total. *Id.*

20. Subsequently, Noah tried to play three more seasons at the University of Antelope Valley (the 2021-2022 season, the 2022-2023 season, and the 2023-2024 season). *Id.* That did not bode well either.

21. Noah broke his hand during the 2022-2023 season, playing only a fraction of the allotted contests for the year. *Id.*

22. Though he was healed to play the next season, the University of Antelope Valley closed down due to alleged financial mismanagement in the middle of that 2023-2024 season. *Id.*[5] Noah played only 30% of contests he would have been able to compete in as a result. *Id.*

23. Noah transferred back to Hawaii Pacific for the 2024-2025 season, where he was able to compete in one more season due to the COVID-19 pandemic exemption. *Id.*

24. Still, by the end of that season, Noah only played two complete seasons of baseball. And none of those seasons of baseball were at a Division I institution. *See id.*

25. Noah then moved to Reno, Nevada , in hopes of continuing his education and athletic career at University of Nevada in the Fall of 2025. *Id.* ¶ 9

26. Due to the Five-Year Rule and its related provisions, Noah and University of Nevada staff attempted to work with the NCAA to obtain a waiver and ultimate extension that would permit him to compete. *Id.* ¶¶ 9–12.

---

[5] Scott Simon, *A California university is shutting down. Its basketball team will have a last dance*, NPR (Mar. 9, 2024), https://www.npr.org/2024/03/09/1237179256/a-california-university-is-shutting-down-its-basketball-team-will-have-a-last-dance.

DICKINSON WRIGHT ATTORNEYS AT LAW

27. Generally speaking, an athlete must show two opportunities to compete were taken or denied in prior years. Bylaw 12.6.1.7; Bylaw 12.6.1.7.1(a)-(b).[6]

28. Accordingly, Noah first needed to seek a hardship waiver to recoup a season of competition. *See* Bylaw 12.6.4. Noah initiated this initial process in October 2025, seeking a hardship waiver for his broken hand. **Ex. B.** ¶¶ 11–12.

29. To date, the NCAA has refused to provide Noah a formal letter denying his request for a waiver. *Id.* ¶ 13. Absent a waiver, Noah cannot recoup a season in order to extend the five-year clock. And, absent a formal denial, Noah cannot appeal any decision on waiver to continue that process. *Id.* ¶ 13, 15.

30. Meaning, although the NCAA indicated in informal channels that Noah's waiver request has been denied, the NCAA has refused to do so in the manner that would allow Noah to appeal. *Id.*

**C. Relevant Market and the NCAA's Monopsony Power Therein**

31. These Eligibility Rules Noah has been trying to navigate affect the labor market competitive collegiate baseball players services —a unique labor market.

32. The relevant geographic market is the United States, as NCAA's member institutions are American collegiate institutions throughout the United States.

33. Within this market of 1,100 member institutions with roughly 300 baseball programs, collegiate athletes like Noah compete for roster and scholarship spots on Division I baseball teams and those NCAA Division I teams compete against each other to recruit the best college athletes to compete on their teams.

34. The NCAA's rules ensure that they maintain exclusive power within this relevant market. The NCAA dictates governing rules for its member institutions, and these member institutions face penalties for noncompliance.

---

[6] *See also* Brad Crawford, *NCAA denies waiver for Ole Miss QB Trinidad Chambliss, likely ending his college career*, CBS Sports (Jan. 9, 2026) (explaining that athletes can only extend the five year clock if denied two seasons of competition in the context of a different athlete seeking relief from the NCAA).



DICKINSON WRIGHT ATTORNEYS AT LAW

35. Because the NCAA's Division I market dominates the market for college athletes who can sell their services, the NCAA exercises monopsony power within the relevant market for college athlete services. *See Braham*, 794 F. Supp. 3d at 834 ("NCAA DI college football, as it is the sole pathway to NFL opportunities, and participation provides unique benefits, including NIL compensation, which are not available elsewhere.").

36. The NCAA has repeatedly recognized as much, in *Alston* and its progeny. 594 U.S. at 86 (recognizing that the NCAA did not challenge the district court's definition of the relevant market, which was the market for "athletic services in men's and women's Division I basketball and FBS football, wherein each class member participates in his or her sport-specific market, or that the NCAA exercised monopsony power in that market); *Martinson*, 804 F. Supp. 3d at 1126 (recognizing that the NCAA conceded at oral argument that the relevant market was "the labor market for competitive college football services, the NCAA has monopsony power").

37. Any athlete seeking to exchange athletic services for educational benefits and the unique advantages of top-tier sports must, as a practical matter, attend one such Division I institution.

38. Collegiate baseball players are no exception.

39. These advantages include the most elite NIL compensation opportunities, revenue sharing opportunities, and increased professional scout exposure unique to the .

40. These NIL also policies stand alongside opportunities to obtain full or partial scholarships for school as well as newfound revenue sharing opportunities. *See* **Ex. C** at 1 ("Division I schools generally have the biggest student bodies, manage the largest athletics budgets and offer the highest number of athletics scholarship.").

41. Indeed, "[p]ost-*Alston*, that the NCAA has monopsony power over the labor market for competitive student-athletes' services has only become more uncontestable, given the fact that NCAA Division I sports accounts for over 99% of NIL opportunities, and, as of July 1, 2025, NCAA members now compete to recruit athletes with *direct* compensation." *Martinson*, 804 F. Supp. 3d at 1125.



DICKINSON WRIGHT ATTORNEYS AT LAW

42. To illustrate, estimates for NIL market spend for baseball in Division I institutions amounts to a total of $387.8 million. Only $1.1 of that market spend is dedicated to baseball players competing outside of the Division I setting.[7]

43. Studies have indicated that, in 2024 alone, the total annual expected earnings for top earners in Division I baseball players based on NIL data from July 1, 2021, to June 7, 2024 was $47,710/year.[8]

44. Even shortly after the *Alston* decision, studies from 2022 estimated that Division I athletes saw an average of $3,711 in NIL compensation, while Division II athletes saw an average of $204 and DIII athletes saw an average of $309.[9]

45. Division I sports also foster the highest level of amateur sports before broaching the professional market. As a result, high-level athletes compete within their team and with other member institutions, creating a product with huge consumer demand.

46. Although the NCAA is structured as a nonprofit organization, its member institutions derive substantial financial benefits from their relationships with student-athletes. These institutions generate revenue from hosting athletic events, merchandise sales, lucrative broadcasting agreements, and increased enrollment interest. In contrast, student-athletes receive only limited benefits, as outlined above.

47. For the reasons listed above, the transactions between member institutions and student-athletes are inherently commercial in nature and fall within the purview of the Sherman Act.

---

[7] *NIL at 3: The Annual Opendorse Report*, Opendorse (July 2024), https://biz.opendorse.com/wp-content/uploads/2024/07/NIL-AT-3-The-Annual-Opendorse-Report-1.pdf, also attached hereto as **Ex. E**. This cite is on pg. 4.

[8] *Opendorse Report*, *supra* at 6.

[9] Erica Hunzinger, *One year of NIL: How much have athletes made?* NBC New York (July 7, 2022), https://www.nbcnewyork.com/news/sports/one-year-of-nil-how-much-have-athletes-made/3765040/.



**D. Anticompetitive Effects**

48. Per its Bylaws, the NCAA maintains that it allows athletes to preserve amateurism, prioritize the academic experience, and promote athlete well-being. *See* **Ex. A** at pg. 12.

49. The NCAA enacts and enforces rules that supposedly achieve this purpose.

50. The NCAA uses its member institutes to adopt and enforce these rules, while the member institutions simultaneously compete for the labor of Division I athletes.

51. By effectuating such rules, the NCAA and its member institutions carry out horizontal agreements that produce anti-competitive effects in the relevant market and harm college athletes.

52. The Eligibility Rules at issue here are one such set of horizontal agreements, thereby violating the Sherman Act.

53. Despite what the NCAA may claim, the Eligibility Rules harm both consumers of college sports and athletes competing in the relevant labor market.

54. The Rules depress labor in the relevant market while commandeering opportunities for NIL, education, personal growth, and well-being that are made available to Division I on the basis that some of the athletes in the market originally competed outside of the Division I context. *See Pavia v. Nat'l Collegiate Athletic Ass'n*, 760 F. Supp. 3d 527, 539 (M.D. Tenn. 2024), *appeal dismissed as moot*, 154 F.4th 407 (6th Cir. 2025). This arrangement violates the Sherman Act.

55. The Eligibility Rules also keep NAIA and Division II transfers out of the Division I market, even though prospective athletes who delay the start of the Division I career by the same amount of time or longer are not subject to analogous restrictions. Athletes who serve in the military, attend a vocational school, and even get drafted into a professional organization, or played in a professional league *before* pursuing collegiate athletics, for example, do not lose out on all four years of valuable Division I competition, exposure, and education solely because they joined



the military, attended a vocational school, or were drafted professionally. *See* NCAA Bylaw 12.6.1.2.[10]

56. Athletes like Noah therefore lose out on a market to sell their labor while athletes who start out at Division I institutions have more time to sell their labor to the same market, reducing the output in that market.

57. The Eligibility Rules at issue perpetuate these harms, though athletes like Noah may have no choice but to play outside Division I. Indeed, the COVID-19 pandemic hamstrung recruiting opportunities for juniors and seniors in high school at the time Noah was a high school prospect.[11] **Ex. B** ¶ 2.

58. These are not hypothetical harms. If Noah cannot play, he cannot take advantage of NIL deals, scholarship offers, and educational opportunities, nor can he gain the attention and acclaim for future athletic opportunities that can only be obtained at a Division I institution. *See Braham*, 794 F. Supp. 3d at 838 (recognizing that another student athlete would stand to "lose the invaluable opportunity for exposure to professional recruiters, thereby diminishing his prospects of securing 'NIL' contracts" and other incalculable losses); *see also* **Ex. B.** ¶¶ 14, 16.

59. This has the effect of decreasing any chances to play professional baseball.

60. To be sure, Noah had no reasonable or realistic NIL opportunities and earned no NIL money in that time despite his status as one of the top Division II baseball players. **Ex. B.** ¶ 18.

61. Nor is there a meaningful alternative for athletes like Noah—who initially played at a NAIA and Division II institution—to simultaneously pursue elite athletics *and* elite education with the unique benefits that come with it. *See id.* ¶¶ 16–19 (explaining Noah had no NIL money

[10] Myron Medcalf, *Who is James Nnaji -- the most polarizing player in college basketball?* (January 15, 2026) https://www.espn.com/mens-college-basketball/story/_/id/47612921/james-nnaji-baylor-nba-draft-pick-2026.

[11] Shamar Walters and Caitlin Fitchel, *As COVID-19 upends falls sports, student-athletes face uncertain futures*, NBC News (Aug. 9, 2020), https://www.nbcnews.com/news/us-news/covid-19-upends-fall-sports-student-athletes-face-uncertain-futures-n1235943.



DICKINSON WRIGHT ATTORNEYS AT LAW

while competing at NAIA or Division II schools and that the only real opportunity for him to get professional scout exposure is via Division I competition).

62. Additionally, absent assured eligibility for the 2025-2026 season, Noah will lose training opportunities and the critical ability to become integrated into the program and the team as a whole. *See Braham*, 794 F. Supp. 3d at 837–38 ("Loss of pre-season opportunities will likely have an incalculable impact on [Noah's] personal experience during the regular season." (internal citations omitted)); **Ex. B** ¶ 21.

63. At a very minimum, this would harm Noah's mental health and overall wellbeing. **Ex. B** ¶ 20.

64. Noah is not alone in this. Other student athletes have been prevented from entering this market as a result of the arbitrary Eligibility Rules. *See, e.g.*, *Humphreys v. NCAA*, Case No. 2:26-cv-00268-WLH-BFM (2026).

65. Further, consumers who attend NCAA athletic events or watch them on television or streaming services will also be negatively affected by the NCAA's arbitrary and unreasonable conduct. It is reasonable to expect that fan interest in college athletics will dissipate if the governing body tasked with regulating and ensuring fair competition fails to do so. The most talented prospective student-athletes may be deterred from attending Division I schools if they believe the NCAA does not promote fair competition and does not treat athletes fairly, especially with the growing availability of other professional sports opportunities in the United States and elsewhere. Moreover, as the court found in *Pavia*, consumers of Division I intercollegiate events will be harmed because the level of competitiveness of Division I teams will be reduced due to the restrictions placed on elite athletes who attend non-NCAA institutions. *See id.* at 540. NCAA Division I member schools also retain a significant recruiting advantage over non-Division I institutions like NAIAs or even Division II institutions, despite subjecting athletes at the latter to the same terms of eligibility.

66. At bottom, because the Eligibility Rules remove competitive athletes from the Division I labor market based on their time outside of the Division I labor market, the Eligibility



DICKINSON WRIGHT ATTORNEYS AT LAW

Rules have negative downstream effects on consumers of Division I sports. Ensuring that these athletes—themselves capable of competing in the Division I market—fosters competition with other Division I athletes. Consumers are in the market for that competition, but they lose out on opportunities to consume competition due to the barriers to entry the Eligibility Rules create.

67. Because Noah has established that the Eligibility Rules create an anti-competitive effect in the relevant market for the reasons listed above, the burden shifts to the NCAA to prove the Rules have a procompetitive justification.

**E. Lack of Procompetitive Justification**

68. Historically, the NCAA has argued that the rules at issue (1) increase the total number of athletes who compete at Division I institutions over time, (2) help sell a unique product, (3) prevent experienced athletes from crowding out younger athletes, and (4) improve the quality of the athlete's experience by ensuring the athletes progress through school in a timely manner. These arguments are pretextual.

69. The NCAA would be hard-pressed to say that the rules restricting the number of years NAIA transfers can compete in the relevant market ultimately increases output, given the host of other exceptions to the Five-Year Rule that keep established Division I athletes in the labor market.

70. For similar reasons, these limits on eligibility do not cause older athletes to crowd-out opportunities from younger athletes. For example, the introduction of the transfer portal also allows older athletes from taking the position of a younger athlete on a daily basis, such that this purported justification appears pretextual.

71. The transfer portal, and its limited restrictions on transfers, also undermines any argument about ensuring students complete their education in a timely manner. Frequent transfers similarly slow the progression through school on a 4-year timeline.

72. Additionally, these Rules do not promote a unique product one way or the other. To illustrate, the NCAA allows students who attend a prep school to engage in secondary education and athletic competition without it counting towards their four seasons of eligibility.



73. Even if these justifications are procompetitive, there are less restrictive means than the Eligibility Rules to achieve those goals. For instance, starting the eligibility clock once an athlete begins competing at a NCAA member institution would ensure that transfers from outside Division I institutions or NAIA transfers are not barred from the labor market.

**COUNT I – VIOLATION OF THE SHERMAN ACT**

74. Noah repeats and realleges each allegation set forth in the preceding paragraphs as if fully set forth herein.

75. Section 1 of the Sherman Act provides in part that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."

76. The NCAA, by and through its officers, directors, employees, agents or other representatives and its member institutions have entered into agreements restricting competition in the relevant market. Namely, the NCAA and its member institutions have agreed to adopt and enforce the aforementioned Eligibility Rules, which collectively restrain non-Division I athletes from participating in the relevant market at the same rate as similarly-situated Division I athletes to the detriment of these athletes as well as the consumers.

77. The NCAA, as well as its member institutions, have a substantial and foreseeable effect on interstate commerce.

78. As demonstrated above, the relevant commercial market here is the labor market where competitive collegiate baseball players seek to offer their services to DI NCAA institutions. The transactions in this market are commercial, thereby falling within the Sherman Act's purview.

79. This restraint fails under the rule-of-reason analysis.

80. As a direct result of these rules, which depress competition by restricting the number of athletes who can enter the labor market, both NCAA athletes who formerly played NAIA sports and consumers of college sports have suffered and continue to suffer antitrust injury.

81. Any benefits in the Eligibility Rules at issue here are scarce, particularly where the NCAA concedes the sole purpose of the five-year restriction is to advance students towards graduation. *See* **Ex. D** at 14.

82. Plus, the harm in removing a whole class of athletes, like Noah, from the labor market because they joined a non-Division I institution outweighs any procompetitive benefit in the Rules.

83. These sorts of Rules are also not necessary to preserve the market as it stands.

84. The NCAA Bylaws could be easily remedied to address Noah's plight. For example, the NCAA could modify the Intercollegiate Competition Rule so that the eligibility clock for transfers outside the Division I apparatus does not start until they compete at a Division I institution.

85. The NCAA's conduct is ongoing and will continue to impose injury on current and former NAIA athletes and consumers of the same, unless injunctive relief is granted. This ongoing harm from the Eligibility Rules has caused, and continues to cause, direct harm to Noah by restricting his ability to obtain scholarships for continued education, restricting his ability to sign contracts for NIL Compensation for the upcoming baseball season, and eliminating recruiting opportunities to showcase his athletic abilities for professional scouts and for advancement beyond his amateur career.

**COUNT II – BREACH OF CONTRACT**

86. Noah repeats and realleges each allegation set forth in the preceding paragraphs as if fully set forth herein.

87. University of Nevada, as an NCAA member institution, has agreed to submit to and abide by the NCAA's rules and regulations in exchange for the benefits of NCAA membership, such as participation in high-level intercollegiate athletic competitions. Furthermore, it has agreed to subject itself to NCAA discipline for any failure to comply with its rules and regulations.



88. Noah, as an athlete enrolled at the University of Nevada and governed by these bylaws, is an implied third-party beneficiary of the contractual relationship between it and the NCAA.

89. The NCAA has a contractual obligation to Noah, as an intended third-party beneficiary, to enforce its rules and regulations fairly, consistently, and reasonably.

90. In this case, the NCAA has failed to do so.

91. For one, the NCAA treats the Five-Year Rule as valid and enforceable, but rulings in *Braham*, *Martinson*, *Pavia*, and others make clear that it is not.

92. The NCAA's insistence that Noah's season spent playing baseball at non-NCAA institutions count against his eligibility to play another season at an NCAA institution is directly contrary to its promise to enforce and adjudicate its rules fairly.

93. Noah's current ineligibility for the 2025-26 Division I college baseball season, based on the Five-Year Rule, clearly indicates that the NCAA has breached its contractual obligations to him because no NCAA rule or regulation in existence authorizes or permits those actions.

94. For another, the NCAA has refused to timely and promptly process his waiver in a way that would allow Noah to seek relief through the NCAA channels. Such dilatory tactics evidence a failure to enforce its rules and regulations fairly, consistently, and reasonably.

95. As an intended third-party beneficiary of the University of Nevada's agreement to be bound by the NCAA rules and regulations, Noah has suffered and continues to suffer substantial and irreparable harm as a result of the NCAA, without any valid contractual authority. Unjustly preventing Noah from playing baseball during the 2025-26 season deprives him of the once-in-a-lifetime opportunity to compete in Division I baseball games, improve his skills, support his teammates, and showcase his talents to future professional employers. Specifically, Noah will be unable to compete in athletic competition and avail himself of the myriad opportunities that emanate from his participation, including lucrative NIL rights and an advanced degree in the field of his choosing.



**COUNT III – TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**

96. Noah repeats and realleges each allegation set forth in the preceding paragraphs as if fully set forth herein.

97. Noah had a reasonable expectation of prospective business relations with the University of Nevada and other third parties, including NIL deals and revenue-sharing opportunities at the University of Nevada.

98. The NCAA knew or should have known of these expectancies through Noah's hardship waiver, which detailed Noah's athletic career, his transfer to the University of Nevada, and his career trajectory.

99. By functionally denying his hardship waiver and enforcing the Five-Year Rule, the NCAA knew that its actions were certain or substantially certain to prevent Noah's ability and opportunity to pursue prospective business relations with the University of Nevada and other third parties, thereby intending him harm.

100. The NCAA denied Noah's hardship waiver without justification, disregarding the extenuating circumstances that prevented him from participating in four seasons at an NCAA institution.

101. This breach has caused Noah damages, including lost eligibility and associated financial and educational opportunities, and irreparable harm to his career, entitling him to specific performance through injunctive relief.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Noah Blythe respectfully prays for a Judgment in his favor and against the NCAA as follows:

A. Declaring that (i) the NCAA's application of Five-Year Rule, and to include time spent at NAIA institutions, violates the Sherman Act; and (ii) Noah is eligible to compete at a Division I institution during the 2025-26 season;



B. Preliminarily and permanently enjoining the NCAA to immediately issue a waiver request and extension to enable Noah to compete at a Division I institution during the 2025-26 season;

C. Preliminarily and permanently enjoining the NCAA from enforcing the Five-Year Rule to include time spent at NAIA institutions;

D. Preliminarily and permanently enjoining the NCAA from enforcing the Rule of Restitution against Noah and any institution for which Noah plays intercollegiate athletics from complying with and/or relying on any injunctive order entered by this Court; and

E. Awarding Noah compensatory and punitive damages, attorneys' fees and costs, prejudgment and post-judgment interest, and such other and further relief as the Court may deem equitable and just.

**DEMAND FOR A JURY TRIAL**

The Plaintiff hereby demands a trial by jury in this action.

DATED: this 9th day of February, 2026

DICKINSON WRIGHT PLLC

By: */s/ Steven A. Caloiaro*
Steven A. Caloiaro
Nevada Bar No. 12344
Mackenzie E. Robinson
Nevada Bar No. 13609
100 W. Liberty Street, Suite 940
Reno, Nevada 89501
Tel.: (775) 343-7500
Fax: (844) 670-6009
scaloiaro@dickinsonwright.com
mrobinson@dickinsonwright.com

*Attorneys for Plaintiff*
*Noah Blythe*



**EXHIBIT TABLE**

| Exhibit | Description | Pages[12] |
|---|---|---|
| A | NCAA 2025-26 Bylaws (Excerpt) | 24 |
| B | Noah Blythe Declaration | 4 |
| C | NCAA Recruiting Fact Sheet (2024-2025) | 2 |
| D | Four-Year Transfer Guidelines | 16 |
| E | OpenSource's NIL at 3: The Annual Opendorse Report | 16 |

12 Exhibit page counts are exclusive of exhibit slip sheets.


