**DICKINSON WRIGHT PLLC**
Steven A. Caloiaro
Nevada Bar No. 12344
Mackenzie E. Robinson
Nevada Bar No. 16309
100 W. Liberty Street, Suite 940
Reno, Nevada 89501
Tel.: (775) 343-7500
Fax: (844) 670-6009
scaloiaro@dickinsonwright.com
mrobinson@dickinsonwright.com

*Attorneys for Plaintiff*
*Noah Blythe*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEVADA**

| | | |
|---|---|---|
| Noah Blythe, | ) | |
| | ) | CASE NO. 3:26-cv-100 |
| *Plaintiff*, | ) | |
| *v.* | ) | **PLAINTIFF'S EX PARTE <u>EMERGENCY</u> MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION** |
| National Collegiate Athletic Association, | ) | |
| *Defendant.* | ) | |

Plaintiff Noah Blythe, ("Noah" or "Plaintiff"), by and through his attorneys, the law firm of Dickinson Wright PLLC, bring the instant Emergency Motion for Temporary Restraining Order and/or a Preliminary Injunction ("Motion"). This Motion is supported by the following Memorandum of Points and Authorities and supporting exhibits, including the (1) Declaration of Steven A. Caloiaro ("Caloiaro Decl.") attached hereto and (2) the Declaration of Noah Blythe ("Noah Decl.") attached hereto and also attached to the Complaint as ECF 1 as Ex. B, in compliance with LR 7-4 in support of the emergency request, the pleadings and papers already on file, and any oral argument the Court may entertain.

//

//

//



DICKINSON WRIGHT
ATTORNEYS AT LAW

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

Under Rule 65 of the Federal Rules of Civil Procedure ("FRCP") and Local Rule 7-4, Noah respectfully asks this Court to enjoin the NCAA from enforcing certain Eligibility Rules (defined below) that irreparably harm Noah's athletic career. Noah seeks to temporarily restrain and enjoin the NCAA from enforcing its Eligibility Rules to prevent him from competing for a NCAA DI institution during the 2026 baseball season on the grounds that the application of these NCAA bylaws violates Section 1 of the Sherman Antitrust Act, such that he can compete in the 2025-2026 season.[1]

The request for relief centers primarily on the NCAA's Bylaws 12.6, 12.6.1, and 12.6.1.1 (collectively, referred to as the "Eligibility Rules"). Commonly referred to as the Five-Year Rule, this web of Eligibility Rules collectively provide that student-athletes are generally permitted four seasons of competition within a five-year window. The NCAA applies the Five-Year Rule regardless of whether student athletes played some of their seasons at non-NCAA institutions, such as those governed by the National Association of Intercollegiate Athletics ("NAIA") or the National Junior College Athletic Association ("NJCAA").

These Eligibility Rules punitively and arbitrarily limit the number of seasons that a student athlete could play at an NCAA DI institution if they began their college athletics career outside of the NCAA in doing so. This means non-NCAA athletes are arbitrarily limited by the NCAA Eligibility Rules to a fraction of the DI seasons allotted to athletes beginning their career at DI schools. The remaining consequence is that these student athletes are deprived of the opportunity to compete at the DI level and enjoy the litany of associated benefits exclusive to the DI market, such as elite academic opportunities, elite coaching and training, name, image, and likeness ("NIL") compensation, national exposure, and the increased potential for professional recruitment. *See Braham v. Nat'l Collegiate Athletic Ass'n*, 794 F. Supp. 3d 824, 834 (D. Nev. 2025)

---

[1] Noah also seeks to enjoin the NCAA from enforcing the "Rule of Restitution"—a draconian NCAA Bylaw that could penalize Noah and the University of Nevada, Reno for seeking and obtaining injunctive relief that allows him to compete this season.



DICKINSON WRIGHT ATTORNEYS AT LAW

(recognizing, in an action regarding a football player, that the DI market was the "sole pathway" for "professional opportunities," "and participation provides unique benefits, including NIL compensation, which are not available elsewhere") (Du, J.); *Martinson v. Nat'l Collegiate Athletic Ass'n*, 804 F. Supp. 3d 1109, 1128 (D. Nev. 2025) (holding that the Five-Year Rule "creates recognized antitrust harms . . . in the form of underemployment due to the categorical exclusion of otherwise qualified workers from the relevant labor market by a monopsonist (the NCAA) in the market" that lead to "further and additional antitrust harm of reduced labor market competition," warranting an injunction) (Boulware, J.). Conversely, if an athlete plays professionally overseas or in the NBA Development League, the clock does not start. Against this backdrop, judges in this District have already enjoined application of these Eligibility Rules as applied to other athletes. *Braham*, 794 F. Supp. 3d at 840; *Martinson*, 804 F. Supp. 3d at 1133.

The Court should do the same here. Noah is just another former non-NCAA athlete hung out to dry by these arbitrary rules. Worse, the NCAA has done so at the eleventh hour. Emergency injunctive relief is therefore appropriate. *See* LR 7-4.

## II. BASIS FOR EMERGENCY *EX PARTE* RELIEF

L-R 7-4 limits emergency motions to true emergencies. "[A]n emergency motion is properly presented to the Court only when the movant has shown (1) that it will be irreparably prejudiced if the Court resolves the motion pursuant to the normal briefing schedule and (2) that the movant is without fault in creating the crisis that requires emergency relief or, at the very least, that the crisis occurred because of excusable neglect." *Lopez v. Sherwin-Williams Co.*, No. 2:24-CV-01021-JAD-NJK, 2025 WL 1939024, at *1 (D. Nev. July 14, 2025).

As to the first factor, Noah properly seeks emergency relief on an *ex parte* basis because he will be irreparably harmed if this Court hears his Motion on a normal briefing schedule. Noah has been recruited and seeks to play the 2026 NCAA DI baseball season with the University of Nevada, Reno ("University of Nevada"). Noah Decl. ¶ 9 (ECF 1, Ex. B). The University of Nevada's 2026 baseball season officially starts this Friday, February 13, when it will play its first game of the season. *Id.* ¶ 21. This game is set to be Noah's debut as an NCAA DI athlete. *See id.*

Unfortunately, absent emergency injunctive relief, Noah will be precluded from participating in not only this game but potentially the entire season, while the parties to this litigation brief and await hearing on this Motion. Consequently, Noah will miss the opportunity he has been dreaming of his entire life—to play baseball for an NCAA DI team—and suffer the irreparable harms attendant to this loss. *See id.* ¶ 19.

Specifically, for each day that Noah cannot play with the University of Nevada this season, he is denied game time against elite opponents, against whom he may improve and hone his skills; gain exposure to scouts for professional baseball leagues, namely the MLB; airtime on regional and national television and radio channels; the ability to market himself to potential third party business partners; and opportunities to negotiate and enter into NIL deals with the University of Nevada and third parties, which may be a significant source of income of any athlete, but particularly young people. *Id.* ¶ 14. Indeed, as Noah has already been offered a substantial NIL offer that is conditioned on his playing in the University of Nevada's 2026 baseball season, it is reasonable to believe that he will have numerous potential deals he is certain to lose without this injunctive relief. *See id.*

In addition, for each day that Noah does not have injunctive relief and, consequently, sits on the bench, the less likely he is to garner the attention and exposure necessary to earn himself these opportunities, all of which are immensely helpful, if not necessary, to rocket his baseball career to a professional team. In fact, Noah has been previously named the Division 2 college baseball player of the year in the PAC-West, an all-conference player, and a first team all American. *Id.* ¶ 19. Nevertheless, people affiliated with MLB teams have informed Noah that he must demonstrate his athletic skills against Division I players to get a realistic opportunity to play professional baseball. *Id.*

Perhaps most importantly, absent this Court's immediate injunctive relief, Noah will be ineligible to play some, if not all, of this season and, accordingly, will lose his pending athletic scholarship that would enable him to attend school. *Id.* ¶ 14. As the deadline for Noah to pay his tuition is February 16, 2026, Noah is running out of time to secure his scholarship money, further

DICKINSON WRIGHT
ATTORNEYS AT LAW

necessitating the Court's consideration of the Motion on an emergency basis and before Noah is forced to drop his classes. *Id.*

As to the second factor, Noah did not create the crisis that requires now emergency relief. In October 2025, he initiated the process to obtain a waiver from the NCAA permitting him to play this season. *Id.* ¶ 11. The NCAA did not apprise Noah of any waiver denial, however, until a mere three weeks before the start of the 2026 season. *Id.* ¶ 13. Even then, the NCAA has only informally notified Noah of its denial, refusing to issue the formal letter necessary for him to appeal the NCAA's decision or to request reconsideration. *Id.* ¶ 15. In effect, Noah's waiver has been pending since October of last year and will remain so until the NCAA chooses to memorialize the decision it has already reached. *Id.* ¶ 13. Counsel also reached out to NCAA's local counsel in view of informal denial, attempting to resolve the dispute. Caloiaro Decl. ¶ 4. Those meet-and-confer efforts failed as of February 4, 2026. *Id.* ¶ 5. On these facts, this crisis is of the NCAA's own design.

Based on the foregoing, Noah seeks emergency *ex parte* relief from this Court to avoid irreparable injury.

## III. RELEVANT BACKGROUND

### A. Adversity in Noah's Baseball Career

Noah is, and has always been, a great baseball player. Right now, Noah hopes to continue playing this game he loves at the University of Nevada. But this endeavor follows a baseball career tortured by a host of hardships outside of his control. His first season at Hawaii Pacific, running from 2020 to 2021, fell squarely in the middle of the COVID-19 pandemic. Noah Decl. ¶ 2. Unlike any ordinary season, Hawaii Pacific only scrimmaged two other teams (and Noah personally only scrimmaged one of those teams). *Id.* Noah in fact played a mere 21 contests or 38% of that season—far below the 56 contests permissible in a standard Division I season. *Id.*

Noah then transferred to University of Antelope Valley ("UAV") for three more seasons. *Id.* ¶¶ 2–6. That fared hardly any better—once more all for reasons out of his control. Although he played the 2021-2022 season, he broke his hand the 2022–2023 season and played a fraction of



DICKINSON WRIGHT
ATTORNEYS AT LAW

the games he could have played but for the injury (14 total games i.e., ~26 percent of allotted contests). *Id.* And then University of Antelope Valley quite literally shut down after going bankrupt in the early part of his next 2023-2024 season. *Id.* Noah was able to transfer back to Hawaii Pacific once again. *Id.* ¶ 7. Even still, by that point, Noah played only two normal baseball seasons:

| | | |
|---|---|---|
| 2020-2021 | Hawaii Pacific | Partial Season- COVID-19 Pandemic |
| 2021-2022 | UAV | Full Season |
| 2022-2023 | UAV | Partial Season- Broken Hand |
| 2023-2024 | UAV | Partial Season- UAV Closes Down |
| 2024-2025 | Hawaii Pacific | Full Season- Obtained extra year due to first COVID-19 season |

**B. Applicable NCAA Bylaws that Punish Athletes Like Noah**

This history leaves Noah timed-out under the NCAA's arbitrary five-year clock. This is because that clock, codified in the NCAA Bylaws as part of the "Five-Year Rule" and its attendant provisions (collectively referred to herein as "Eligibility Rules"),[2] provides that college athletes generally have four seasons of eligibility and five years to complete those four seasons. *See* NCAA Bylaw 12.6–12.6.1.1 (ECF 1, Ex. A at pg. 15). And the NCAA takes it a step further; that clock

[2] Each NCAA division maintains its bylaws, with amendments proposed by member institutions. These "Eligibility Rules," as defined herein, generally include in Bylaw 12.6, 12.6.1, 12.6.1.1, and 12.02.3. Bylaw 12.6 provides: "A student-athlete shall not engage in more than four seasons of intercollegiate competition in any one sport. An institution shall not permit a student-athlete to represent it in intercollegiate competition unless the student-athlete completes all seasons of participation in all sports within the time periods specified below." Bylaw 12.6.1 then adds that the "four seasons of intercollegiate competitions" must be completed "within five calendar years from the beginning of the semester or quarter in which the student-athlete first registered for a minimum full-time program of studies in a collegiate institution." Bylaw 12.6.1.1 clarifies that the five-year clock begins to tick as soon as the student athlete "attends the student's first day of classes." And, finally, Bylaw 12.02.3 defines intercollegiate competition as "occur[ring] when a student-athlete in either a two-year or a four-year collegiate institution does any of the following: ... (a) [r]epresents the institution in any contest against outside competition." A collegiate institution is defined as an institution "accredited at the college level by an agency or association recognized by the secretary of the Department of Education and legally authorized to offer at least a one-year program of study creditable toward a degree"; or "[c]onducts an intercollegiate athletics program, even though the institution is not accredited at the college level and authorized to offer at least a one-year program of study creditable toward a degree." Bylaw 14.02.4.



DICKINSON WRIGHT ATTORNEYS AT LAW

started to run the second Noah enrolled full-time and played at Hawaii Pacific. *See id.* Meaning, that year he had to play during the COVID-19 Pandemic counts against him. That year he broke his hand counts against him. And probably worst of all: that year his school quite literally shut down in the early part of his season counts against him.

So, Noah has been trying to work with the NCAA through the University of Nevada for a waiver and an extension of that five-year clock. Noah Decl. ¶¶ 9–12 That has not boded well either. Though Noah and University of Nevada staff diligently began the process to obtain the waiver and eligibility extension back in October 2025, Noah has yet to receive a formal letter denying the waiver. *Id.* ¶ 11–13. It is true that the NCAA has communicated through informal avenues that the waiver has been denied. *Id.* But the NCAA has not issued a formal letter indicating as much. *Id.* And, by the NCAA's own recognition, that formal letter is necessary to appeal the NCAA's waiver decision or seek reconsideration. *Id.* ¶ 13.

## III. LEGAL STANDARD

Federal Rule of Civil Procedure 65 governs preliminary injunctions and TROs. The standard for issuing a TRO is "substantially identical" to the standard for issuing a preliminary injunction. *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). Under these standards, Noah must show (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm; (3) that the balance of hardships favors the plaintiff; and (4) that the injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

## IV. ARGUMENT

Balancing these injunctive-relief factors, the Court should enjoin the NCAA's enforcement of the Eligibility Rules as applied to Noah. This District has already done so in cases like *Martinson* and *Braham*, and the outcome should be no different here. *Braham*, 794 F. Supp. 3d at 833 (enjoining enforcement of, inter alia, the Five-Year Rule following rule-of-reason test because "[i]n the post-*Alston* collegiate athletic world, the challenged eligibility rules are so intertwined with commercial rules and benefits that they are, in essence, 'commercial' in nature"); *Martinson*, 804 F. Supp. 3d 1109, 1118 (D. Nev. 2025) (enjoining Five-Year Rule as a likely "undue restraint

DICKINSON WRIGHT
ATTORNEYS AT LAW

on trade imposed by the NCAA's monopsony power over" the unique DI labor market). Here too, the Eligibility Rules are commercial. The Eligibility Rules affect baseball players trying to sell their services in the unique labor market available only at the Division I level. The Eligibility Rules create a substantial anti-competitive effect in doing so, where the NCAA enjoys monopsony power. The Eligibility Rules lack sufficient procompetitive justifications and could be served by less anticompetitive means. And Noah will suffer the immediate threatened injury of losing out on the 2025-2026 season absent injunctive relief, along with all of the athletic, monetary, career, and educational benefits that come with this season of baseball.

### A. Noah Will Likely Succeed on the Merits of His Antitrust Claim

Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. There are several frameworks for assessing antitrust violations under the Act. *See Alston,* 594 U.S. at 88–89. Courts often apply the "rule of reason" test to NCAA Bylaws. *See id.* at 94 (employing three-step burden shifting framework); *Braham*, 794 F. Supp. 3d at 833 (enjoining enforcement of, inter alia, the Five-Year Rule following rule-of-reason test because "[i]n the post-*Alston* collegiate athletic world, the challenged eligibility rules are so intertwined with commercial rules and benefits that they are, in essence, 'commercial' in nature").

Under this three-step test, the plaintiff must first demonstrate that the challenged restraint has a substantial anticompetitive effect on the relevant labor market. *Braham*, 794 F. Supp. 3d at 834. To do this, the plaintiff must show that the defendant "(1) participated in an agreement that (2) unreasonably restrain[s] trade in the relevant market." *Id.* (internal citations omitted). If a plaintiff meets this burden, then it shifts to the defendant to show a "sound procompetitive justification" for the Eligibility Rules. *Id*. at 836. If a defendant provides a satisfactory rationale,



DICKINSON WRIGHT
ATTORNEYS AT LAW

the burden shifts back to the plaintiff to show that "proposed alternatives can achieve such procompetitive effects with less anticompetitive means." *Martinson*, 804 F. Supp. 3d at 1131.[3]

**1. The Eligibility Rules are Commercial in Nature**

As an initial matter, the at-issue Eligibility Rules are commercial in nature. Now that *Alston* opened the door to NCAA compensation and other financial incentives, "the challenged eligibility rules are so intertwined with commercial rules and benefits that they are, in essence, "commercial" in nature." *Braham*, 794 F. Supp. 3d at 833. Those inherently commercial benefits—such as the sort of NIL compensation available at the Division I level—is recoverable *only if* an athlete can enter that market. *Id.* (recognizing DI as the "sole pathway" to NIL opportunities); *Pavia v. Nat'l Collegiate Athletic Ass'n*, 760 F. Supp. 3d 527, 534 (M.D. Tenn. 2024), *appeal dismissed as moot*, 154 F.4th 407 (6th Cir. 2025) (recognizing that a student athlete had substantial NIL interest which he could attain under the Five-Year Rule). As the *Braham* court put it, "the Five-Year Rule as applied to" players who played part of their career outside of NCAA institutions "is commercial in nature because it is tied to potential NIL agreements, which are commercial transactions." *Braham*, 794 F. Supp. 3d at 833 (quotation marks omitted). Now more than ever, this remains true given the "House Settlement," which has jumpstarted revenue-sharing opportunities across NCAA"s DI schools.[4] *Robinson v. Nat'l Collegiate Athletic Ass'n*, 803 F. Supp. 3d 481, 497 (N.D.W. Va. 2025) ("Moreover, eligibility is even more commercial now that the settlement has been approved in *In re College Athlete NIL Litigation*, 2025 WL 1675820 (N.D. Cal. June 6, 2025)

---

[3] The amount of analysis required under the rule-of-reason test varies. Recently, courts have opted for the "quick look" test, given the NCAA's obvious "monopsony power and the fact that the Five-Year Rule amounts to a horizontal agreement among member institutions competing for athletic talent to exclude a class of otherwise qualified and sought after athletes." *Martinson*, 804 F. Supp. 3d at 1127. A quick-look test can identify those obvious restraint on trade in a "twinkling of an eye." *Alson,* 549 U.S. at 91 (citations omitted).

[4] E.g., Chris Murray, *How the three main tenets of NCAA's House settlement will drastically impact Nevada and MW*, Nevada Sports Net (Mar. 6, 2025), https://nevadasportsnet.com/news/reporters/how-the-three-main-tenets-of-ncaas-house-settlement-will-drastically-impact-nevada-and-mw.

(Wilken, J.) ) (colloquially known as the "House Settlement"). Thus, the Eligibility Rules are sufficiently commercial.

### 2. The Eligibility Rules Have a Substantial Anticompetitive Effect on the Relevant Labor Market

#### i. The Eligibility Rules Constitute a Horizontal Agreement in the Relevant Labor Market

Just like the NCAA compensation rules at issue in *Alston*, the NCAA's Eligibility Rules also constitute horizontal agreements among competing schools. *Alston*, 594 U.S. at 79; *Pavia*, 760 F. Supp. 3d at 540. This is because all rules adopted by the NCAA, including the Eligibility Rules, are enacted and amended by votes of the member institutions and their governing councils.[5] By enforcing Eligibility Rules, the NCAA dictates who may enter the market and how long they may stay. *See Business Elec. Corp. v. Sharp. Elec. Corp.*, 485 U.S. 717, 730 (1988) (describing how horizontal agreements are agreements between competitors at the same level in a given sector); *Horizontal Agreement*, *Black's Law Dictionary* (12th ed. 2024) (defining a horizontal agreement as "an understanding or arrangement between competitors operating at the same level of the market or economy in relation to the production and distribution of goods or services, as with two manufacturers"). By extension, the NCAA wields the power to dictate who is eligible to participate in NCAA programs and to reap the commercial benefits of such participation as a result, decreasing input in this market. And the NCAA and its members (~300 of which have baseball programs)[6] accomplish this task in a labor market where they hold monopsony power, i.e., "market power on the buy side of the market." *Le v. Zuffa, LLC*, 216 F. Supp. 3d 1154, 1163 (D. Nev. 2016); *Dyer v. Conoco, Inc.,* 49 F.3d 727 (5th Cir. 1995) ("The oligopsony or monopsony, by virtue of its ability to dictate the price, thus, can force the seller to bear a loss.").

To be precise, antitrust law assesses both the product market and the geographic market. *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1045 n.4 (9th Cir. 2008). Geographically, the

---

[5] *Overview,* NCAA, https://www.ncaa.org/sports/2021/2/16/overview.aspx (last visited Feb. 7, 2025); *Governance*, NCAA, https://www.ncaa.org/sports/2021/2/9/governance.aspx. (last visited Feb. 7, 2025).

[6] *Conferences*, D1Baseball https://d1baseball.com/conferences/ (last visited Feb. 2, 2026).



DICKINSON WRIGHT
ATTORNEYS AT LAW

relevant market here is the United States. Product- or service-wise, the relevant market here is that nationwide labor market for competitive college baseball services, where those baseball players are trying to sell their services to DI institutions. *Accord Martinson,* 804 F. Supp. 3d at 1125 (explaining that the central antitrust injury arises in the "input labor market for competitive college football services" in a case about a football player); *Braham*, 794 F. Supp. 3d at 834 (explaining that "the relevant market is NCAA DI college football" in a case about a football player); *Robinson v. Nat'l Collegiate Athletic Ass'n*, 803 F. Supp. 3d 481, 500 (N.D.W. Va. 2025) (defining the relevant market as "the nationwide market for the labor of NCAA Division I college football players"). The NCAA has recognized the same when faced with analogous challenges to its Bylaws. *See, e.g.*, *Alston*, 594 U.S. at 86 (recognizing that the NCAA did not challenge the district court's definition of the relevant market, which was the market for "athletic services in men's and women's Division I basketball and FBS football, wherein each class member participates in his or her sport-specific market, or that the NCAA exercised monopsony power in that market); *Martinson*, 804 F. Supp. 3d at 1126 (recognizing that the NCAA conceded at oral argument that the relevant market was "the labor market for competitive college football services," where "the NCAA has monopsony power").

And it is within this discrete market that DI colleges compete against each other to recruit the best college athletes for their athletic teams and athletes compete to be recruited. It is also within this market where the NCAA retains monopsony power as the buyer of competitive baseball services who can also offer all the unique benefits found only in the DI setting. *See Martinson*, 804 F. Supp. 3d at 1125 ("That the NCAA has monopsony power over the labor market for competitive student-athletes' services has only become more uncontestable, given the fact that NCAA Division I sports accounts for over 99% of NIL opportunities, and, as of July 1, 2025, NCAA members now compete to recruit athletes with direct compensation."); *see also* Roger D. Blair Jeffrey*, Antitrust Policy and Monopsony*, 76 Cornell L. Rev. 297, 309 (1991) ("[U]nder the auspices of the NCAA, collusion among these putative rivals [i.e., member schools] has reduced

DICKINSON WRIGHT
ATTORNEYS AT LAW

the quantity and price of a major input used in the production of the members' final output, college sports.”).

Noah’s case, like all the other athletes bringing analogous challenges, illustrates this dynamic. *See, e.g., Humphreys v. NCAA*, Case No. 2:26-cv-00268-WLH-BFM (2026) (injunctive relief pending). Indeed, though Noah was arguably as elite as any baseball player could be while he played at NAIAs and DII schools, he still had no NIL opportunities. Noah Decl. ¶ 18. This follows from the sort of dollars being thrown at DI baseball. It is estimated that less than $1.1 million in NIL compensation is paid to non-DI athletes, while an approximate $124.9 million is shared among non-P4 and non-G5 DI athletes. (ECF 1, Ex. E at 4). Noah also stands to have much greater professional exposure at a DI school. And this follows from the practical realities of the MLB draft, where the ability to join Major League Baseball (“MLB”) exponentially increases by entering and participating in the labor market of DI member schools’ baseball programs. Per summaries of the 2025 MLB Draft, of the total 615 players drafted, 80 percent (491 of the 615 draft picks) were college players.[7] Of those 491 draft picks, 436 of them were NCAA DI athletes.[8] In other words, 71 percent of all 2025 MLB Draft picks were drafted out of DI baseball teams. In comparison, an abysmal 2.1 percent of all 2025 Draft picks came from DII member schools. Even worse, 1.1 percent were drafted from NAIA schools.[9] The NCAA cannot ignore these market realities.

**ii. The Eligibility Rules Harm Participants of the Relevant Market**

Twice already, judges in this District have recognized that the Eligibility Rules harm labor markets like the one defined here, as the rules unreasonably restrain trade. *Braham*, 794 F. Supp. 3d at 834 (“Braham is correct in that the Five-Year Rule harms competition in the relevant market by excluding a qualified cohort[.]”); *Martinson*, 804 F. Supp. 3d at 1128. Namely, these rules limit

---

[7] 2025 MLB Draft, *The Baseball Cube* https://www.thebaseballcube.com/content/draft_year/2025/ (last visited February 7, 2026).

[8] *Id.*

[9] *Id.*



DICKINSON WRIGHT ATTORNEYS AT LAW

the amount of time a former non-NCAA student athlete may play DI baseball after they transfer into the market simply because they chose to attend a non-NCAA school first. Quoting *Pavia*, judges in this District have already noted that "the NCAA eligibility rules 'giv[e] a competitive advantage to NCAA Division I member schools over junior colleges – and thus the football players at each level' and that the 'disparate treatment of these two groups also results in a distortion of the labor market for NCAA Division I football players.'" *Braham*, 794 F. Supp. 3d at 835 (quoting *Pavia*, 760 F. Supp. 3d at 539–40).

So too with DI baseball. In essence, the Eligibility Rules amount to no more than an agreement to limit the amount of time athletes may play DI baseball because they have chosen to attend a non-NCAA before transferring to a DI NCAA college. These same restrictions are not placed on athletes who choose to delay entry to a DI NCAA college to attend prep school, serve in the military, or even compete professionally in another sport. In this way, the Eligibility Rules harm non-NCAA who have already or will in the future transfer to the NCAA in four main areas of the relevant markets: (1) when an athlete is deciding whether to attend a non-NCAA institution after high school graduation; (2) when an athlete is deciding whether to play a sport while attending a non-NCAA institution; (3) when an athlete is deciding whether to attend a non-NCAA institution for multiple years or transfer to an NCAA DI college; and (4) when an athlete has transferred from a non-NCAA institution to a NCAA DI college and has their eligibility limited.

**3. There Are No Pro-Competitive Justifications for the Eligibility Rules**

The burden shifts to the NCAA to prove a pro-competitive justification for the Eligibility Rules, which it cannot satisfy. *Alston*, 594 U.S. at 109 (Kavanaugh, J., concurring) ("the NCAA may lack such a [procompetitive] justification"). Yet again, judges in this District have previously rejected the NCAA's arguments twice: in July 2025 with the *Braham* decision, and again, four months ago, in the *Martinson* decision. *Braham*, 794 F. Supp. 3d at 836 (rejecting the NCAA's justifications of "(1) preserving college athletics as a unique product that is differentiated from professional sports; (2) expanding opportunities for prospective and current student-athletes; and (3) better aligning athletics and academics"); *Martinson*, 804 F. Supp. 3d at 1129 (rejecting the



DICKINSON WRIGHT
ATTORNEYS AT LAW

same pro-competitive justifications argued by the NCAA). That was the right decision. Fundamentally, there is no pro-competitive justification to limit the eligibility of student athletes who transfer from non-NCAA schools, nor to deprive them of the benefits, financial or otherwise, that are available to NCAA DI baseball players.

Taking them in order, *Braham* and *Martinson* first considered the suggested justification that the Eligibility Rules "preserv[e] college athletics as a unique product that is differentiated from professional sports." *Braham*, 794 F. Supp. 3d at 836; *Martinson*, 804 F Supp. 3d at 1129. *Braham* astutely pointed out that "if the 'unique' and 'differentiated' product for the NCAA is an established and fixed version of what it means to be a 'student-athlete,' this runs counter to the NCAA's other exceptions to its Five-Year Rule that allow for older students to join after prep school, military service, and/or religious obligations." *Braham*, 794 F. Supp. 3d at 836 (internal citations omitted). Faced with the same justification in *Martinson*, Judge Boulware questioned whether college athletics may even be considered a "unique product" by its consumers and added to *Braham*'s reasoning by holding that "construing the harm to student-athletes as a benefit to consumers does not justify the antitrust harm in the relevant labor market based upon the exclusion of certain otherwise qualified workers." *Martinson*, 804 F. Supp. 3d at 1129. Here, that would be non-NCAA student athletes.

As to the NCAA's second pro-competitive justification that the Eligibility Rules "expand[ ] opportunities for prospective and current student-athletes," "this justification runs afoul of the basic economic principle that greater competition in a labor market generally leads to better outcomes for workers." 804 F. Supp. 3d at 1130. In other words, the Eligibility Rules do the total opposite. *Martinson* correctly deemed the justification facially *not* procompetitive and, indeed, "suggests the NCAA is attempting to artificially 'even the playing field' to ensure student-athletes who are likely less experienced and less desirable to Division I institutions have more opportunities to participate in the labor market." *Id.*

Finally, as to the third pro-competitive justification previously presented by the NCAA ("better aligning athletics and academics"), it has been dubbed "inconsistent with the fact that

student-athletes obtaining a graduate degree are eligible to compete in Division I athletics . . . And again, the NCAA does not explain why this justification . . . is procompetitive within the labor market for purposes of antitrust analysis." *Id.* at 1130; *Braham*, 794 F. Supp. 3d at 836 (rejecting same argument). It is reasonable that the NCAA member institutions must coordinate on some level for DI college baseball to exist. Indeed, "some degree of coordination between competitors within sports leagues can be procompetitive," for without agreed-upon rules of a given sport, "the very competitions that consumers value would not be possible." *Alston*, 594 U.S. at 90. However, "[t]hat some restraints are necessary to create or maintain a league sport does not mean all 'aspects of elaborate interleague cooperation are.'" *Id*. (quoting *Am. Needle, Inc. v. NFL*, 560 U.S. 183, 199 n.7 (2010)). In fact, "[a]s the *Alston* Court explained, the NCAA admits that it participates in 'horizontal price fixing in a market where the defendants exercise monopoly control.'" *Ohio*, 706 F.Supp.3d at 591 (quoting *Alston*, 594 U.S. at 86). Like the compensation-related restrictions at issue in *Alston*, the Eligibility Rules "fall on the far side of this line."

**4. Any Potential Procompetitive Justifications for the Eligibility Rules Could Be Accomplished by Less Restrictive Means.**

Judges in this District have also endorsed less restrictive means to achieve any potential procompetitive justifications for the Eligibility Rules. *Braham* agreed with student-athlete's proposed alternatives: (1) to not count non-NCAA seasons of competition toward the Eligibility Clock; (2) to provide former non-NCAA transfer students with an extra year of eligibility; or (3) to change the definition of "intercollegiate competition" to exclude non-NCAA institutions. 794 F. Supp. 3d at 936–37. *Braham* also specifically noted that "[t]he existence of the exceptions under the Five-Year Rule that allow for alternate forms of post-secondary education and athletic competition without affecting the eligibility clock highlights the unfairness of treating JUCO competition as analogous to DI competition." *Id.* at 837. The same is true here. The exclusion of non-NCAA student athletes who transfer into the NCAA later in their college careers is "plainly unfair" because it, without justification, "restricts the number of years athletes have to compete for such opportunities." *Id.*

DICKINSON WRIGHT
ATTORNEYS AT LAW

*Martinson* also acknowledged that "both the academic and amateurism goals of the NCAA, to the extent they can be discerned, are accomplished through less restrictive alternatives already in place within NCAA bylaws." 804 F. Supp. 3d at 1131 (quoting *Ohio*, 706 F. Supp. 3d at 596–97)). Specifically, Bylaw 14.4.1, "requires student athletes to maintain progress toward a degree at the institution where they compete," and Bylaw 20.2.4.12, "which requires member institutions to publish their progress-toward-degree requirements, and other bylaws that require minimum credit hour and grade point averages for eligibility." *Id.*; (ECF 1, Ex. A at pg. 23-24).

In sum, the three-step Rule of Reason analysis reveals that the Eligibility Rules are the exact kinds of unreasonable restraints of trade antitrust laws prohibit. Noah therefore has a strong likelihood of success on the merits of his Sherman Act claim.

**B. Noah Will Suffer Immediate and Irreparable Harm Without Injunctive Relief.**

The next focus centers on the "irreparable harm in the absence of preliminary relief." *Martinson*, 804 F. Supp. 3d at 1131 (citing *Winter*, 555 U.S. at 20). "Irreparable harm is proven by demonstrating 'immediate threatened injury.'" *Id.* (quoting *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 675 (9th Cir. 1988)). In the sports context, it is well established that "a student-athlete's loss of opportunity to play sports is irreparable." *Martinson*, 804 F. Supp. 3d at 1131; *S.A. v. Sioux Falls School Dist*. 49-5, 2023 WL 6794207, at *9 (D. S.D. Oct. 13, 2023) ("College students suffer irreparable harm when they are denied the opportunity to play sports."); *Navarro v. Fla. Inst. Of Tech., Inc.*, 2023 WL 2078264, at *16–17 (M.D. Fla. Feb. 17, 2023) (noting that courts have consistently held that losing the opportunity to participate in sports constitutes irreparable harm); *Biedigerv. Quinnipiac Univ.,* 616 F. Supp. 2d 277, 291 (D. Conn. 2009) ("Courts have consistently held that, given the fleeting nature of college athletics, plaintiffs will suffer irreparable harm by losing the opportunity to participate in their sport of choice on a continuous and uninterrupted basis.").

Applying these principles here, irreparable harm will occur here absent injunctive relief. Noah will be disqualified from the 2025–2026 season which will (1) deny him pending and

DICKINSON WRIGHT
ATTORNEYS AT LAW

potential NIL compensation; (2) preclude him from exposure to and consideration by scouts; and (3) devastate any chance of playing professionally. *See* Noah Decl. ¶¶ 14–22. On this first point, if Noah's baseball career is prematurely ended by the Eligibility Rules, he will be forced to forego NIL compensation that has already been offered to him. *Id.* Even more importantly, if he is removed from an NCAA DI team, he will lose the opportunity to "market [his] name and likeness and showcase abilities to future employers"—a loss that "cannot be estimated or quantified." *Martinson*, 804 F. Supp. 3d at 1131 (internal quotations omitted); Noah Decl. ¶ 14. Because the Eligibility Rules will block his ability to sign NIL contracts, businesses and brands will move forward with other athletes, forever eliminating Noah's ability to represent such businesses and brands. Moreover, Noah will lose the educational opportunities and experiences of which he may presently avail himself while attending the University of Nevada. Noah Decl. ¶ 14. Such a loss "cannot be quantified," particularly at Noah's young age. *Martinson*, 804 F. Supp. 3d at 1131 (internal quotations omitted).

As to the second and third points, if a baseball player is not professionally drafted out of high school, then the NCAA is the surest route to get the exposure necessary to compete professionally. According to summaries of the 2025 MLB Draft, of the total 615 players drafted, 80 percent (491 of the 615 draft picks) were college players.[10] Of those 491 draft picks, 436 of them were NCAA D1 athletes.[11] An abysmal 2.1 percent of all 2025 Draft picks came from DII member schools and 1.1 percent were drafted from NAIA schools.[12] If the Court does not grant Noah his requested relief, he will be immediately disqualified from playing in the 2025–2026 season and altogether lose exposure to scouts and MLB team, thereby missing the opportunity to advance to a professional baseball league. His baseball career will certainly die at the feet of the

---

[10] 2025 MLB Draft, The Baseball Cube, https://www.thebaseballcube.com/content/draft_year/2025/ (last visited Feb. 6, 2026).

[11] *Id.*

[12] *Id.*



DICKINSON WRIGHT ATTORNEYS AT LAW

NCAA and its discriminatory Eligibility Rules. And Noah's mental health and well being, at the very least, will suffer as a result. *Id.* ¶ 20.

**C. The Balance of Equities**

"To determine which way the balance of the hardships tips, a court must identify the possible harm caused by the preliminary injunction against the possibility of the harm caused by not issuing it." *Univ. of Haw. Prof'l Assembly v. Cayetano*, 183 F.3d 1096, 1108 (9th Cir. 1999).

Here, the NCAA will suffer no harm if athletes like Noah are permitted an additional season at a DI member school. As an initial matter, requiring the NCAA to comply with federal antitrust laws cannot constitute harm. See *Calvert Health, LLC v. Four Leaf Liquidators*, LLC, No. 3:23-CV-00110, 2024 WL 69953, at *10 (M.D. Tenn. Jan. 5, 2024) ("Defendants face no hardship as a consequence of their compelled compliance with federal law"). Moreover, its operations, governance of member schools, and financial performance will be completely unaffected by issuance of a TRO. Moreover, if it should later succeed on the merits, it can simply terminate Noah's eligibility.

Noah, on the other hand, has everything to lose—NIL compensation and the coaching, training, and national exposure necessary to continue his career beyond college. He should be allowed to avail himself of the present and future economic potential that participation in the upcoming season may present. Absent this injunctive relief, Noah's entire career will die at the NCAA's feet. Accordingly, the balance of the equities supports Noah's Motion and favors issuance of injunctive relief enjoining the enforcement of the Eligibility Rules. *See Martinson*, 804 F. Supp. 3d at 1132; *Braham*, 794 F. Supp. 3d at 839; *Ohio*, 706 F. Supp. 3d at 600.

**D. Injunctive Relief Serves the Public Interest of Promoting Free and Fair Competition in Labor Markets**

Injunctive relief preventing the NCAA from enforcing the Eligibility Rules would serve the public interest in promoting free and fair competition in the labor market, as guaranteed by the antitrust laws. *Braham*, 794 F. Supp. 3d at 839 ("[T]he public interest is served by promoting free and fair competition in the DI market for college football."); *Ohio*, 706 F. Supp.3d at 600 (granting

a TRO because "[p]rotecting competition in the labor market for NCAA DI student-athletes serves the public's interest in free and fair competition in labor markets."); *Williams*, 2024 WL 397760, at *3. (noting that "free and fair competition in the labor markets is essential to the American economy").

Here, college athletes compete for scholarship positions on NCAA rosters, and its member institutions compete for the best athletes. The NCAA's discriminatory Eligibility Rules disproportionately harm student-athletes seeking to transfer to NCAA member schools from non-NCAA institutions and altogether precludes many of them from entering the market at all. Thus, enjoining the Eligibility Rules "serves the compelling public interest of promoting increased participation and competition in the competitive college [baseball] services labor market." *Martinson*, 804 F. Supp. at 1132.

**E. This Court Should Enjoin the NCAA From Enforcing the Rule of Restitution**

The clear purpose and effect of the Rule of Restitution, Bylaw 12.11.4.2, is to deter challenges to the NCAA's anti-competitive and improper rules and rulings by making it impossible for student-athletes and member schools to rely on validly entered court orders and to obtain meaningful injunctive relief. Specifically, if the student athlete and the member school rely on a court-issued order or injunction enjoining unlawful conduct by the NCAA, the Rule of Restitution nevertheless empowers the NCAA to punish the athlete and the school if the injunctive relief is later revoked. *Ohio*, 706 F.Supp.3d at 601 ("The breadth of the Rule of Restitution is staggering and goes well beyond final adjudication on the merits in the NCAA's favor. It is, in fact, a measure designed to inhibit a person's access to the courts."). As a result, member schools often do not permit the student athlete to compete even if they obtain hard-fought injunctive relief for fear of retroactive punishment.

Several courts have enjoined the NCAA from enforcing the Rule of Restitution against student-athletes and their respective institutions who rely on a temporary restraining order or preliminary injunction when participating in intercollegiate athletics. *Martinson*, 804 F. Supp. at 1133; *Williams*, 2024 WL 397760, at *9; *Pavia*, 760 F. Supp. 3d at 545; *Ohio*, 706 F.Supp.3d at



DICKINSON WRIGHT
ATTORNEYS AT LAW

601–02 (explaining that the Rule of Restitution's "purpose is to punish challenges to the NCAA's anticompetitive rules by attempting to deprive courts of the ability to grant effective relief and depriving individual student-athletes and member institutions of the practical ability to rely on court orders in their favor"). This Court should follow suit. If it grants Noah's requested injunctive relief, it must also enjoin the NCAA from enforcing the Rule of Restitution to punish Noah or the University of Nevada, Reno from relying on a valid and effective court order.

### F. A FRCP 65 Bond Need Not Issue

Federal Rule of Civil Procedure 65(c) provides, in pertinent part: "The court may issue a preliminary injunction ... only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Here, however, the NCAA will suffer no costs or damages because of this injunction. Even if an injunction or TRO is ultimately found to have been in error, the NCAA would not incur any damages or costs as a result. Accordingly, the Court should find no bond is necessary in this instance.

## IV. CONCLUSION

Based on the foregoing, Noah respectfully requests this Court issue a TRO (1) enjoining the NCAA from enforcing its Five-Year Rule and related Eligibility Rules that bar Noah from participating in the 2025-2026 NCAA Division I baseball season; (2) enjoining the NCAA from enforcing the Rule of Restitution against Noah or any NCAA member institution that permits Noah to compete pursuant to any temporary or preliminary injunctive relief that this Court may issue; and (3) issuing such other and further relief as the Court may deem equitable and just.

DATED: this 9th day of February, 2026.

DICKINSON WRIGHT PLLC

By: */s/ Steven A. Caloiaro*
Steven A. Caloiaro
NV Bar No. 12344
Mackenzie E. Robinson
NV Bar No. 16309
100 W. Liberty Street, Suite 940
Reno, Nevada 89501
Tel.: (775) 343-7500

scaloiaro@dickinsonwright.com
mrobinson@dickinsonwright.com

*Attorneys for Plaintiff*
*Noah Blythe*