UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| NOAH BLYTHE,<br><br>             Plaintiff,<br>    v.<br><br>NATIONAL COLLEGIATE ATHLETICS ASSOCIATION,<br><br>             Defendant. | Case No. 3:26-cv-100-ART-CSD<br><br>ORDER ON MOTION FOR TEMPORARY RESTRAINING ORDER/PRELIMINARY INJUNCTION<br>(ECF Nos. 3, 4) |

Plaintiff Noah Blythe sued Defendant National Collegiate Athletic Association ("NCAA") alleging violations of federal antitrust laws, breach of contract, and tortious interference with contractual relations and seeking to block enforcement of NCAA's Five-Year Rule (Bylaw 12.6).

On February 11, 2026, Plaintiff filed the instant Motion for a Temporary Restraining Order ("TRO") and Motion for a Preliminary Injunction. (ECF Nos. 3, 4.) Finding the Motion warranted consideration on an expedited basis, the Court set a briefing schedule and received Defendant's Opposition on February 12, 2026. (ECF No. 15.) On February 13, 2026, this Court held a hearing on the pending motions and orally granted the preliminary injunction, with this written order to follow.

**I.    Factual Background**

    **a.  Noah Blythe's Collegiate Baseball Career**

Plaintiff seeks to play baseball at University of Nevada, Reno ("UNR"), a NCAA Division I ("DI") school, after several years playing collegiate baseball at non-DI colleges. (ECF 1 at 5-6.)

Plaintiff began his collegiate baseball career at Hawaii Pacific University ("Hawaii Pacific"), an NCAA Division II ("DII") school, during the 2020-2021

1

1  season, which was cut short by the COVID-19 pandemic. (ECF No. 4 at 5.) He
2  then transferred to University of Antelope Valley ("UAV"), a National Association
3  of Intercollegiate Athletics ("NAIA") program, for the next three seasons. (ECF No.
4  4 at 6.) During the 2022-2023 season, Plaintiff broke his hand, playing fourteen
5  total games; during the 2023-2024 season, UAV declared bankruptcy and
6  permanently closed. (*Id.*) Plaintiff then transferred back to Hawaii Pacific, where
7  he applied a COVID-19 season-of-competition waiver which allowed him to
8  compete in the 2024-2025 baseball season. (*Id.*) Thus, Plaintiff argues that he
9  only played two full seasons: 2021-2022 and 2024-2025 at Hawaii Pacific. (*Id.*)
10 Under NCAA Bylaws, however, Plaintiff has participated in five seasons of
11 competition and has run out his five-year eligibility clock. (ECF No. 15 at 8; 15-
12 1 at 6.)

13  In fall 2025, Plaintiff was recruited by UNR, an NCAA DI school, and in
14 October 2025 applied for a hardship waiver for the season he lost to his broken
15 hand. (ECF No. 1 at 7.) According to the NCAA, Plaintiff's waiver was denied on
16 October 31, 2025, first by the Mountain West Conference, and then on appeal by
17 NCAA staff. (ECF No. 15 at 9.) The NCAA gave Plaintiff oral notice of the denial in
18 December 2025 and informally in writing on January 23, 2026. (*Id.*) Plaintiff
19 claims that without a formal letter of denial from the NCAA, he has not been able
20 to appeal the decision or seek reconsideration. (ECF No. 4 at 7.)

21  Plaintiff seeks injunctive relief in time for him to compete in the first game
22 of the UNR baseball season on February 13, 2026. (ECF No. 4 at 20.) In
23 particular, he seeks a TRO and/or preliminary injunction to enjoin the NCAA
24 from enforcing its Five-Year Rule and Rule of Restitution. (ECF No. 1 at 18.)

25 **b. NCAA Bylaw 12.6: The Five-Year Rule**

26  The Five-Year Rule states that a student-athlete "shall not engage in more
27 than four seasons of intercollegiate competition in any one sport" and "shall
28 complete the student-athlete's seasons of participation within five calendar years"

1  of their first semester of full-time study at a collegiate institution. (ECF No. 1-1
2  at 16, NCAA Bylaw 12.6.) "Intercollegiate competition" includes competition at
3  two-year or four-year institutions, including those that are not members of the
4  NCAA. (*Id.* at 14; NCAA Bylaw 12.02.3.)

5      There are exceptions to the Five-Year Rule for religious missions, military
6  service, or foreign aid service. (*Id.*) Students can also apply for waivers of the Five-
7  Year Rule for "circumstances beyond control," which the NCAA refers to as a
8  "Hardship Waiver." (*Id.* at 17; ECF No. 15 at 8.) These include situations
9  supported by medical documentation, natural disasters, and extreme financial
10  difficulties as a result of a specific life-altering event. (ECF No. 1-1 at 17, NCAA
11  Bylaw 12.6.4.)

12  **II.   Legal Standard**

13      To qualify for preliminary injunctive relief, a plaintiff must establish: (1)
14  likelihood of success on the merits; (2) likelihood of irreparable harm; (3) that the
15  balance of equities tips in his favor; and (4) that an injunction is in the public
16  interest. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

17      A plaintiff seeking a mandatory, as opposed to prohibitory, injunction,
18  "must establish that the law and facts clearly favor her position." *N.D. v. Rekydal*,
19  102 F.4th 982, 992 (9th Cir. 2022). A mandatory injunction "orders a responsible
20  party to take action" whereas a prohibitory injunction "simply maintain[s] the
21  status quo." *Id.* (quoting *Garcia v. Google*, 786 F.3d 733, 740 (9th Cir. 2015) (en
22  banc) (internal citations omitted). "There is no good blanket answer to the
23  question of what the status quo is," *Id.* (quoting *Labrador v. Poe by & through Poe*,
24  144 S. Ct. 921, 930, 218 L. Ed. 2d 400 (2024) (Kavanaugh, J., concurring), but
25  the Ninth Circuit has found it can be "categorized as one of action versus
26  inaction." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1060 (9th Cir. 2014).

27      Because Plaintiff satisfies the *Winter* factors, and the law and facts "clearly
28  favor" his position sufficient for a mandatory injunction, the Court grants the

requested preliminary injunctive relief. *See LA Alliance for Human Rights v. County of Los Angeles*, 14 F.4d 947, 956 (9th Cir. 2021) (setting forth the standard for a mandatory preliminary injunction).

### III.     Analysis

#### a. Preliminary Injunction

##### i. Likelihood of Success on the Merits

First, the Court finds Plaintiff is clearly likely to succeed on the merits of his challenge to the NCAA's five-year eligibility rule (the "Five-Year Rule") as it applies to his time at playing baseball at non-DI colleges under Section I of the Sherman Antitrust Act. *Matsumoto v. Labrador*, 122 F.4th 787, 804 (9th Cir. 2024) (likelihood of success on the merits is the most important factor in a preliminary injunction analysis).

##### 1. Five-Year Rule is Commercial

The Five-Year Rule is subject to antitrust scrutiny because it is "commercial in nature." *Worldwide Basketball & Sports Tours, Inc. v. Nat'l Collegiate Athletic Ass'n*, 388 F.3d 955, 958 (6th Cir. 2004). Many courts in the post-*Alston* landscape have found the Five-Year Rule on eligibility is a commercial rule for antitrust purposes because it restricts the ability of student-athletes to negotiate NIL agreements and receive direct compensation from a DI school. *See, e.g. Elad v. Nat'l Collegiate Athletic Ass'n*, 160 F.4th 407, 415 (3d Cir. 2025) ("The District Court did not err in holding that the JUCO Rule is commercial because it interferes with Elad's desire to compete in NCAA Division I athletics and profit from that participation"); *Pavia v. Nat'l Collegiate Athletic Ass'n*, 154 F.4th 407, 421 (6th Cir. 2025) (Hermandorfer, J., concurring) (the NCAA cannot "immunize any trade restraint from review by deeming it 'eligibility' related'"); *Fourqurean v. Nat'l Collegiate Athletic Ass'n*, 143 F.4th 859, 863 (acknowledging Seventh Circuit holding in *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 340-341 (7th Cir. 2012), that "the Sherman Act applies to the NCAA bylaws generally");

4

*Patterson v. Nat'l Collegiate Athletic Ass'n*, 2026 WL 115417, at *5 (M.D. Tenn. Jan. 15, 2026); *Robinson v. Nat'l Collegiate Athletic Ass'n*, 803 F. Supp. 3d 481, 498-97 (N.D. W. Va. 2025); *Martinson v. Nat'l Collegiate Athletic Ass'n*, 804 F. Supp. 3d 1109, 1124 (D. Nev. 2025). The Court therefore finds that the Sherman Act applies to the Five-Year Rule because it is commercial in nature.

### 2. **Relevant Market is Division I Collegiate Baseball Labor Market**

Before turning to the three-step rule of reason analysis, the Court "must first define the relevant market" defined as "the area of effective competition," or "the arena within which significant substitution in consumption or production occurs." *Ohio v. Am. Express Co.*, 585 U.S. 529, 542-543 (2018).

Many courts considering antitrust challenges to NCAA eligibility rules, including the Five Year Rule, have held that "labor markets within NCAA Division I college athletics in the United States are relevant antitrust markets." *See Ohio v. Nat'l. Collegiate Athletic Ass'n.*, 706 F. Supp. 3d 583, 592 (N.D. W.Va. 2023); *Alston*, 594 U.S. at 90 (recognizing "market for student athlete services"); *Braham v. Nat'l Collegiate Athletic Ass'n*, 794 F. Supp. 3d 824, 834 (D. Nev. 2025) (finding relevant market is NCAA DI college football, as it is the sole pathway to NFL opportunities, and participation provides unique benefits, including NIL compensation, which are not available elsewhere").

Several courts have recognized that the NCAA has, if not a monopsony, considerable power over the relevant market, because it has the "sole ability to dictate the rules and regulations for participation." *Ohio v. Nat'l. Collegiate Athletic Ass'n.*, 706 F. Supp. 3d at 592; *see also Alston*, 594 U.S. at 89-90 (observing the NCAA's concession that its members collectively enjoy monopsony power in the market for student-athlete services); *Martinson*, 804 F.Supp.3d at 1125 (explaining that post-*Alston* and in light of changes allowing direct compensation to DI student athletes, the NCAA's "monopsony power over the

1  labor market for competitive student-athletes' services has only become more
2  uncontestable"). A monopsony is a market structure where a firm has
3  concentrated market power on the buyer side of the input market. *Martinson*, 804
4  F. Supp. 3d at 1125 (citing *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber*
5  *Co., Inc.*, 549 U.S. 312, 320 (2007), *United States v. Syufy Enterprises*, 903 F.2d
6  659, 663 n.4 (9th Cir. 1990) ("[m]onopsony is a market situation in which there
7  is a single buyer ... monopsony and monopsony power are the general equivalent
8  on the buying side of monopoly and monopoly power on the selling side.")).
9  Accordingly, the Court finds that the Division I collegiate baseball labor market
10 is the relevant market.

11 The Court finds that the Plaintiff has provided sufficient evidence to
12 demonstrate the relevant market is the Division I collegiate baseball labor market,
13 and the NCAA has significant market power in that market, because there is no
14 other employer offering the unique athletic, academic, and financial benefits of a
15 Division I collegiate program. *See Martinson*, 804 F. Supp. 3d at 1125 (noting that
16 NCAA Division I sports accounts for over 99% of NIL opportunities). Plaintiff
17 personally observes that despite playing at an elite level in the NAIA and Division
18 II programs, he was never offered an NIL opportunity, and 71 percent of MLB
19 draft picks in 2025 came from NCAA DI schools. (ECF No. 4 at 12; ECF No. 4-2
20 at 4 (Noah Blythe Declaration)*; see generally* ECF No. 1-5 (*Opendorse* Report
21 measuring NIL compensation for DI athletes)).

### 3. Rule of Reason Three-Step Burden Shifting

23 Under *National Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 80 (2021),
24 courts apply a "three-part, burden shifting framework" of the rule of reason as
25 the standard for antitrust scrutiny of the NCAA's bylaws. First, the plaintiff must
26 prove that the restraint has a "substantial anticompetitive effect" within the
27 identified market. *Alston*, 594 U.S. at 96 (citing *Am. Express Co.,* 585 U.S. at 541-
28 542). If that burden is met, the defendant must show a procompetitive rationale

for the restraint. *Id.* Then the burden shifts back to the plaintiff to show that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means. *Id.*

### a. Anticompetitive Effect

The Court considers whether Blythe has presented sufficient evidence that the challenged Five-Year Rule unreasonably restrains trade within the labor market for NCAA DI college baseball. Anticompetitive effect can be shown by demonstrating "proof of market power plus some evidence that the challenged restraint harms competition." *Martinson*, 804 F. Supp. 3d at 1127 (quoting *Am. Express Co.,* 585 U.S. at 542 (citations omitted)).

The NCAA Bylaws operate as horizontal restraints on the market because they are agreements between competitors at the same level in a particular industry. *Id.* (citing *Business Elec. Corp. v. Sharp. Elec. Corp.,* 485 U.S. 717, 730 (1988))*; see also Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 99-100 (1984) (NCAA as an association that prevents member institutions from competing against each other on the basis of price establishes a horizontal restraint); *Pavia*, 760 F. Supp. 3d at 539 ("The eligibility regulations imposed by the NCAA and its member organization generally constitute horizontal agreements"). Antitrust harm can result from horizontal agreements through wage suppression, *see Alston*, 594 U.S. at 82, underemployment or nonemployment*, see Martinson*, 804 F. Supp. 3d at 1127, or reducing competition between employers, *see Pavia*, 760 F. Supp. 3d at 540; *Deslandes v. McDonald's USA, LLC*, 81 F.4th 699, 704 (7th Cir. 2023).

Courts have found the Five-Year Rule has several anticompetitive effects that harm student-athletes and institutions. The rule restrains a labor market participant's ability to compete for positions within their area of knowledge or expertise for four full seasons. *Martinson*, 804 F. Supp. 3d at 1127-28 (citing *Deslandes*, 81 F.4th at 702). It causes commercial harm by denying otherwise

7

qualified student-athletes access to the financial, academic, and professional benefits of employment at a DI institution. *Braham*, 794 F. Supp. 3d at 835-836; *Pavia*, 760 F. Supp. 3d at 540; *Robinson*, 803 F. Supp. 3d at 501. It gives NCAA DI member schools a competitive advantage over non-member schools in recruiting talented athletes. *Braham*, 794 F. Supp. 3d at 835; *Pavia*, 760 F. Supp. 3d at 540; *Robinson*, 803 F. Supp. 3d at 501. And it prevents DI institutions from hiring the student-athletes it wants. *Martinson*, 804 F. Supp. 3d at 1128.

It is no different in this case. The Five-Year Rule forecloses the opportunity for qualified student-athletes from non-NCAA schools from entering a labor market for DI baseball that comes with considerable financial, academic, and professional benefits simply because of their non-NCAA status. Therefore, the Court finds that the Five-Year Rule has a substantial anticompetitive effect on the relevant market.

### b. Procompetitive Rationale

Turning to the NCAA's procompetitive rationales, it argues that the Five-Year Rule is justified by the goals of "(1) preserving college athletics as a unique product that is differentiated from professional sports; (2) promoting the purposes of the educational institutions student-athletes attend; (3) balancing the interests and opportunities of all student-athletes; and (4) better aligning academics and athletics." (ECF No. 15 at 22.) These procompetitive rationales largely mirror those considered and rejected as insufficient by courts in resolving similar challenges to the Five-Year Rule.

As to the first rationale regarding the NCAA's "unique product," here and other cases the NCAA has provided no evidence that consumers recognize competitive college baseball as a "unique product" specifically because of the Five-Year Rule. *See Martinson*, 804 F. Supp. 3d at 1129. The NCAA argues that "eligibility rules" define what it means to be a student-athlete and therefore create the product of intercollegiate athletics. (ECF No. 15 at 22.) While participation

8

1   eligibility rules are inevitably part of any athletic system, in this context
2   numerous exceptions to the Five-Year Rule complicate what it means to be a
3   student-athlete. For example, excluded from the eligibility clock is a student's
4   time playing sports professionally or at a post-high school prep school, or their
5   military or religious service before attending a DI institution. *See Braham,* 794 F.
6   Supp 3d at 836 (there is no "fixed version" of what it means to be a student athlete
7   under the NCAA Bylaws); *Pavia,* 760 F. Supp. 3d at 541-542 (no differentiated
8   product given the treatment of other student-athletes with comparable or more
9   post-secondary experience); *Robinson,* 803 F. Supp. 3d at 503. These exceptions
10  highlight that age and experience are not essential to the NCAA's "unique
11  product" of competitive college baseball.

12      The NCAA's second rationale of promoting the "fundamental purposes of
13  educational institutions" is substantially the same as its first rationale. It states
14  that the Five-Year Rule was adopted "to ensure fair competition in sports, to
15  enhance the production of collegiate sports, to maintain a balance between
16  academics and athletics for collegiate student athletes, and to ensure that
17  collegiate sporting events continue to attract the interests of consumers/fans."
18  (ECF No. 15 at 22.) The NCAA offers no evidence of how these efforts serve the
19  fundamental purposes of educational institutions, besides claiming that the rules
20  ensure "student-athletes must be students, as well as athletes." (ECF No. 15 at
21  23.) This and other courts have already rejected this argument.

22      The NCAA's third rationale that the rule balances the interests and
23  opportunities of all student-athletes has also been rejected by other courts. The
24  NCAA suggests that by extending eligibility for student-athletes coming from non-
25  DI schools, newly eligible student-athletes will be disadvantaged because their
26  spots will be taken by "holdovers." (ECF No. 15 at 25.) The Court in *Martinson*
27  found that "[t]his justification runs afoul of the basic economic principle that
28  greater competition in a labor market generally leads to better outcomes for

workers." 804 F. Supp. 3d at 1130. Additionally, the concern that non-DI athletes will take the spots of less experienced incoming freshmen and deprive them of the opportunity to compete is not persuasive in the face of the transfer portal, which allows DI programs to fill roster spots with experienced players from other schools. *Pavia*, 760 F. Supp. 3d at 542 (NCAA's own transfer rule can have the effect of a school opting for a more experienced player); *Robinson*, 803 F. Supp. 3d at 503; *Martinson*, 804 F. Supp. 3d at 1130.

The NCAA's final rationale on aligning athletics and academics has also been found unconvincing by other courts in light of the ability for students to transfer between DI schools each year, disrupting the standard degree progression. *Robinson*, 803 F. Supp. 3d at 503 (citing *Pavia*, 760 F. Supp. 3d at 543). Neither does the progression of a four-year baccalaureate degree hold water when students are eligible while pursuing graduate degrees. *Martinson*, 803 F. Supp. 3d at 1130. Further, the goal of aligning academics and athletics does not appear to be grounded in consideration of a procompetitive impact related to employment, wages, or profit. *Id.* (citing *Alston*, 594 U.S. at 94 (whether a restraint of trade serves some "social good" is irrelevant to antitrust analysis because the "statutory policy of the [Sherman] Act is one of competition)).

Thus, the justifications that the NCAA provides for its Five-Year Rule do not meet its burden of advancing a procompetitive rationale.

### c. Less Anticompetitive Means

Having found no legitimate procompetitive rationale, the Court could conclude its analysis at step two of the rule of reason test and grant relief to Plaintiff. For the sake of completeness, the Court addresses step three of that test and concludes that any procompetitive rationales for the Five-Year Rule could be achieved through less anticompetitive means, as Plaintiff proposes.

As a preliminary matter, several courts have acknowledged that existing bylaws already serve the goals that the NCAA posits are the purpose of the Five-

10

Year Rule. For example, Bylaw 14.4.1 requires that a student maintain progress toward a degree, ensuring that they are a student. (ECF No. 1-1 at 24) *see also Martinson*, 804 F. Supp 3d at 1131 (citing *Ohio*, 706 F. Supp. 3d at 596) (goals of the NCAA are accomplished through less restrictive alternatives already in place). Therefore, the Court finds that there are less anticompetitive alternatives to the Five-Year Rule, including those already used by the NCAA.

Here Plaintiff endorses the alternatives offered and found effective in *Braham*: "(1) to not count non-NCAA seasons of competition toward the Eligibility Clock; (2) to provide former non-NCAA transfer students with an extra year of eligibility; or (3) to change the definition of 'intercollegiate competition' to exclude non-NCAA institutions." (ECF No. 4 at 15 (citing *Braham*, 794 F. Supp. 3d at 936-37); ECF No. 1 at 14.) These alternatives would avoid the anticompetitive and arbitrary treatment of non-NCAA DI student-athletes while satisfying the rationales advanced by the NCAA. For example, the proposed rules maintain restrictions on the duration of eligibility as well the linkage to natural degree progression within the DI institution. *See Pavia*, 760 F. Supp. 3d at 543.

Plaintiff has therefore clearly demonstrated a likelihood of success on the merits on his antitrust claim.

## ii. **Irreparable Harm**

The Court finds that Plaintiff faces immediate and irreparable harm if injunctive relief is not granted, as he stands to lose the time-sensitive opportunity to be compensated for and market his NIL, an opportunity which cannot be easily quantified or monetarily compensated, as well as his scholarship to attend and complete his graduate degree at UNR. *See Arizona Dream Act Coalition v. Brewer*, 757 F.3d 1053 (9th Cir. 2014) (holding the loss of opportunity to pursue ones chosen profession, particularly early in life, may constitute irreparable injury). In so concluding, the Court agrees with numerous others that have found that a student-athlete's loss of opportunity to play sports is irreparable. *See e.g., Ohio*,

11

706 F.Supp.3d at 597 (collecting cases), *Pavia*, 760 F.Supp.3d at 544; *Braham*, 794 F. Supp. 3d at 837; *Martinson*, 804 F. Supp. 3d at 1131.

### iii. Balance of Equities and Public Interest

The Court finds the third and fourth *Winter* factors, namely the balance of equities and public interest, tip in Plaintiff's favor.

As to the balance of the equities, in the absence of relief, Plaintiff will suffer immediate, irreparable—even permanent—harm due to the time-sensitive loss of season play, compensation and related opportunity. The NCAA conceded at the hearing it will not. *See e.g., Pavia*, 760 F.Supp.3d at 544 (holding that enjoining enforcement of the Five-Year Rule as to the plaintiff would not cause "substantial harm" to others or to the NCAA); *Braham*, 794 F. Supp. 3d at 838-39; *Martinson*, 804 F. Supp. 3d at 1131; *see also League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 765 (9th Cir. 2014) (holding the balance of equities tipped in favor of the plaintiff whose harm in the absence of the injunction was permanent, whereas the harm to the defendant if the injunction was wrongful was temporary).

And fourth, the Court finds the public interest is served by the enforcement of the Sherman Act here to ensure "free and fair competition in labor markets..." *Ohio*, 706 F.Supp.3d at 600; *Martinson*, 804 F. Supp. 3d at 1131; *Braham*, 794 F. Supp. 3d at 837-38; *Pavia*, 760 F. Supp. 3d at 544.

### b. Rule of Restitution

The Court further finds the NCAA must be enjoined from enforcing the Rule of Restitution for the relief granted here to be meaningful. The NCAA did not oppose such an injunction in their brief (ECF No. 15) or at the hearing.

### c. Motion to Seal

With its opposition to the Motion for Temporary Restraining Order/Preliminary Injunction (ECF No. 15), the NCAA also filed an unopposed Motion to Seal and Redact Document (ECF No. 16). A "good cause" standard

governs requests to seal materials related to non-dispositive motions. *Kamakana v. Cnty. of Honolulu*, 447 F.3d 1172, 1179 (9th Cir. 2006). The Court finds that there is good cause to redact portions of Exhibit B (ECF No. 18) given that they contain the confidential medical and educational records of Plaintiff. *See Laron v. Wright Med. Tech., Inc.*, 587 F. Supp. 3d 1065, 1071 (D. Nev. 2022) (sealing medical records); *Dale v. Williams*, 3:20-cv-00031-MMD-CLB, 2022 WL 2872702, at *3 (D. Nev. Jul. 21, 2022) (sealing education records because information was confidential and sensitive).

### IV. Conclusion

It is therefore ordered that Plaintiff's Motion for Temporary Restraining Order/Preliminary Injunction (ECF Nos. 3, 4) is GRANTED.

It is further ordered that Defendant's unopposed Motion to Seal (ECF No. 16) is GRANTED.

Dated this 20th day of February, 2026.

_____
ANNE R. TRAUM
UNITED STATES DISTRICT JUDGE